IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action |
| | ) | No. 09-3002-01-CR-S-RED |
| JOSE ROSARIO, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. The government has responded. A hearing was held before the undersigned on April 28, 2009. Defendant was represented by Stuart P. Huffman. Assistant United States Attorney Gary K. Milligan appeared on behalf of the government.

Defendant asserts that evidence and statements obtained as a result of a commercial motor vehicle stop should be suppressed on the grounds that the officer lacked reasonable suspicion to justify the stop and subsequent search of the vehicle, and lacked probable to arrest defendant. He also contends that the search and seizure exceeded the scope of the consent to search given by defendant.

On January 14, 2009, Agent Rick Talbert, Missouri State Highway Patrol Commercial Motor Vehicle Officer, stopped a tractor trailer with New Jersey license plates on I-44 in Greene County, Missouri. He stopped it because he was not familiar with the name of the company on the side of the truck. He does this a lot when he is not familiar with the company to make sure that the vehicle

is in compliance with the commercial vehicle regulations. He had not seen any traffic violation before he pulled the truck over. He identified himself to the driver, asked for his registration, fuel license, driver's license, and medical card. He usually asks if there is someone else in the vehicle for his own safety. Defendant was identified as the co-driver, and the driver was Luis Mendez-Franco. Both of them provided the documents for which the officer asked, including log books. Once he talked to them, he advised them that he would take the paperwork to his truck to look over, and then would start the inspection. He had seen some inconsistencies in the logbooks, and noted a lot of downtime. For instance, the log book showed a stop for a whole state, not a town, which is not the normal way of doing it. He also noticed there were several days of downtime in New Jersey before they started, and they had three more days of downtime in Dallas. Usually, a normal trucking operation will have its schedule planned without downtime and with a load set up wherever they go. Because of the inconsistencies, he made contact with Corporal Tom Hall, a uniformed member of the Missouri State Highway Patrol, and asked him to come to his location. Corporal Hall is familiar with the trucking industry and conducts criminal investigations, which Officer Talbert does not do. Before Corporal Hall arrived, Officer Talbert began to conduct a walk-around inspection of the vehicle. He had also entered the information he had obtained from both drivers into the computer to have that checked. As he conducted the walk-around inspection of the vehicle, he noticed that there was a light out on the trailer, and the low-air warning light or buzzer was not working. If the low-air warnings, both visual and audible, are not working, the system has to be fixed before the vehicle can continue. He talked to them about the problem, and defendant told him that he thought he could fix it. The officer was finishing the inspection while defendant worked on the system. He thought maybe it took about 30-45 minutes before Corporal Hall arrived; the inspection was still going on when he got there. This is a typical amount of time for a roadside inspection. He spoke

to both men in English, and there was no problem with understanding them. They did not have any problems communicating. Defendant was particularly able to converse well.

On cross examination, the officer admitted that there are a lot of smaller trucking operations that he would not be familiar with. This stop was one of the first he had made that day, but on any given day, he might stop from one to nine vehicles. In making this inspection, there was nothing about the walk-around that made him feel that he should conduct a more detailed inspection. In asking about the downtime in Dallas, the driver and co-driver stated that they could not find a load. They told him that they were trying to find a load so they wouldn't have to drive empty back to New Jersey. The officer admitted that this is a reasonable explanation for the downtime. Officer Talbert reiterated that he called Corporal Hall because of the downtime, and the fact that they said they were traveling back this direction looking for a load. He thought this was odd, given the availability of cell phones. Also, defendant Mendez-Franco seemed nervous when he was providing his paperwork. His hands were trembling, and he couldn't find his medical card, which was in his wallet right in front of him. Beyond this, there was nothing to suggest that there was illegal activity occurring. He has the authority to conduct an exterior inspection, and can look inside the vehicle for safety compliance issues, but cannot otherwise search the interior. Therefore, he called Corporal Hall, who has more authority to conduct an actual search and investigation. Defendant got the low-air warning system fixed right before Corporal Hall arrived. Officer Talbert continued to work on the paperwork until the other officer arrived, and had not finished the paperwork when he got there. He knew he was on his way, and the only thing that was preventing the drivers from getting on the road was fixing the low-air warning system. The vehicle was stopped at 7:52 a.m., and the inspection report was completed at 10:00. He assisted Corporal Hall with the search, and did not finish the paperwork until after the search of the vehicle. He testified that both he and Corporal Hall

were in uniform and were armed. If the drivers had left without the paperwork, there would not be a violation. He did not let the drivers know that they were free to leave.

On redirect examination, the officer testified that while defendant was fixing the truck he was doing the paperwork in his vehicle. Defendant honked his horn and waved at him to tell him he was finished. He was still working on the inspection report, and he would normally have to verify that the problem was fixed before he could complete the report. He did not recall going back and checking that it was fixed before Officer Hall arrived. This was typical that he would be working on paperwork while the other officer was en route. It was also typical that he would assist the patrol officer on the scene. He did not intentionally delay working on the paperwork waiting for Corporal Hall to get there.

The government next called Corporal Tom Hall, who works for the Missouri State Highway Patrol. He mainly works patrolling on I-44. On January 14, 2009, he received a call from Officer Rick Talbert at home, before 8:00 a.m. He said he had stopped a truck on the interstate and the driver had some paperwork that he found suspicious. He has worked with Officer Talbert before in these kinds of cases. He is a K-9 officer, and that is one reason he is often called for stops that might involve narcotics. He arrived on the scene about 8:19 a.m. Officer Talbert was looking at paperwork when he arrived. He told Corporal Hall about the conversations with the driver and defendant, and gave him the logbooks. Corporal Hall testified that when he looked at the logbook, "there was [sic] several items in the logbook that I found odd and didn't seem consistent with a legitimate trucking company." [Tr. 27]. These included: the fact that the drivers in this case had filled out a separate log page for every day that they were off, instead of one page; the fact that they left New Jersey without showing in the logbook that they had loaded a load there; and throughout their trip, they did not put down details about where they stopped, but rather, just named the state.

The main thing he noticed that he thought was suspicious was that they had gotten to Dallas, unloaded a load, and showed in their logbook that they were down for three more days in that area. Most truck drivers would not do this because they are not making money when the truck is empty. Once he saw this information and talked to Officer Talbert, he spoke to the driver. He asked about why they were traveling empty. The driver said they couldn't find a load in Dallas, so were hoping to drive to Illinois and find a load there. When Corporal Hall was by the truck, there was a strong smell of air freshener that was very overwhelming, and a large dog inside the truck. It is uncommon to have an overwhelming smell of air fresheners, and he had never seen a driver and co-driver with a large dog in the truck with them.. At first, the driver was fairly calm, but once the officer told him he was suspicious about the trip and pointed out some indicators of drug activity, the driver became nervous. He avoided eye contact and his hands were shaking. Corporal Hall them asked for consent to search the tractor and trailer. The driver said, "yes," and agreed to unlock the trailer. [Tr. 29]. The trailer was completely empty, and it was odd to him that it was locked. After they looked in the trailer, he again asked if he could search the truck, and the driver said he could. Corporal Hall had not seen defendant, who never came out of the sleeper area. He had come to know, however, that defendant was in the sleeper area. Defendant would have been able to hear him from the back of the cab. He asked the driver to get defendant and the dog out of the truck so he could search it. When he was coming out, defendant indicated with a nod, "in a confirming manner" that they could search the truck. [Tr. 31]. He had the two men and the dog go over with Corporal Beckett about 20 feet away from the truck. Then, Corporal Hall went into the truck with Officer Talbert and searched the truck. They found 24 bundles of cocaine in a compartment in the roof of the sleeper area. The officer corroborated Officer Talbert's testimony regarding having no problems conversing with the men in English. He stated that defendant did not appear confused when he

asked him about searching the cab of the truck, and everything he had told defendant Mendez-Franco about his suspicions were said when he was standing by the cab in a voice that could be heard throughout the cab.

On cross examination, Corporal Hall testified that he did not ask defendant if he had overheard the conversation, nor did he explain to defendant why he wanted to search. When he arrived, he did not know if Officer Talbert had or had not completed his walk-around inspection. He did not pay that much attention to defendant when he came out of the back of the cab, and could not say whether he appeared to have just awakened. Up until the point that he started talking about illegal activity, he had not noticed any nervousness on the part of Mendez-Franco. He acknowledged that Mendez-Franco told him they could not get a load in Dallas, and that they might have had a load in Laredo, but they didn't want to drive there. So, they started driving in hopes that they might find a load in Illinois. His opinion was that, based on the type of errors in the logbook, they had not been in the trucking business very long. Regarding the smell, he testified that air fresheners could have been used because of the dog, but that it is unusual to have such an overwhelming smell from them. His reasonable suspicion for the search was based on the logbook and the downtime, the air fresheners, and the fact that they were coming from a narcotics source area to a heavy user area in New Jersey. He didn't pay that much attention to defendant and whether he was nervous. He agreed that the mistakes in the logbook could have been based on lack of knowledge.

On redirect examination, the officer testified that he did not see anything about defendant coming out of the cab that indicated he was asleep. He reiterated that it is not typical to drive without a load.

Defendant called Mr. Mendez-Franco to the witness stand. He has been a truck driver for

three years. He used to work with local truckers. This was his first time being an over-the-road driver, and a friend offered him a job to drive. They were to be paid by the trip. The truck belonged to defendant, who had the company named J&R. He had had experience with logbooks before. They left Camden, New Jersey, with a load of chickens. When they got to Dallas, they delivered the load, and then went to a truck stop where they searched for a load. Defendant did the checking on the Internet and by cell phone. They did not find a load in Dallas, and at some point they decided to go back empty. Defendant's son's birthday was coming up, and they thought they would start driving and look for a load along the way. When they were stopped, he was driving. He'd been stopped before for a vehicular inspection, where they check everything in the truck. There were no problems with the truck, and no talk about a low-air warning not working. There was nothing said about fixing the truck or repairs being done. Neither one of them made any repairs. He thought the second officer arrived pretty quickly. He denied that either officer mentioned anything about the logbook. He told them why they were down in Dallas, and how they left without a load and started back. According to Mendez-Franco, his knowledge of logbooks was that you would prepare one sheet for each day. When the search occurred, Officer Talbert never told them that the inspection was complete and they were free to leave. He thought they would be able to leave after the inspection was complete because there was nothing wrong with the truck. They did not leave because Officer Talbert did not return their licenses and paperwork. He thought the inspection of the vehicle only took about ten minutes. He did not feel that he was nervous or that his hands were shaking when he talked to the first officer. They had air fresheners because of the dog in the truck. It was defendant's dog. Regarding the logbooks, sometimes they didn't know the name of the city where they stopped, so they just put the state. When the officer asked for consent to search, he did not think he could refuse consent and leave. Defendant was in the sleeper part of the truck when

Officer Hall started the search; defendant was looking for paperwork or something that Talbert had asked for. After they searched the trailer and then asked for consent to search the truck, he did not feel that he could leave or drive away. There were three officers there in uniform.

On cross examination, defendant Mendez-Franco testified that Officer Talbert asked him for all his paperwork. They gave him all the paperwork and he started processing it. When defendant was in the back, he was sleeping and he told him to wake up and get the paperwork. When the second officer arrived, defendant was just sitting in the back. He was not sleeping. Mendez-Franco testified that defendant could hear what was going on. He testified that he had been a trucker for over three years, and knew how to do logbooks. He actually started working for defendant the day they left from New Jersey, but he noted seven days of "off duty" in the logbook because that was how he was taught to do it. The logbook started with this trip. Regarding the walk-around inspection, he now remembered on cross examination that there was a low air-warning light problem, and that defendant said he would fix it. After they dropped off the load in Dallas, they stayed there for the weekend. They thought they would try to wait until Monday to try to get another load. Regarding the search of the truck, he acknowledged that he gave consent to search the trailer and unlocked it for the officer; he gave consent to search the cab, and had no problem with that; and defendant also had no problem with the search. Mendez-Franco testified that he did not know about the drugs and therefore, he had no problem giving consent.

On redirect examination, Mr. Mendez-Franco testified that he put the seven days down because of DOT regulations.

Initially, the law is clear that probable cause is not needed to stop a commercial motor vehicle for inspection. United States v. Mendoza-Gonzalez, 363 F.3d 788, 794 (8th Cir. 2004). The Supreme Court has held that "a warrantless search of property in certain closely regulated industries

is constitutional if the rules governing the search offer an adequate substitute for the Fourth Amendment warrant requirement." Id. at 793-94.

In this case, a full review of the testimony adduced at the suppression hearing indicates that the vehicle in question was a commercial motor vehicle, and that the officer was acting within his authority and discretion when he stopped it. Although he noticed an unfamiliar name on the truck, he had the authority to stop it regardless as part of his duties as a commercial motor vehicle inspector. There is no question that he made a valid traffic stop, and that once a routine traffic stop occurs, the investigating officer is entitled to conduct an investigation reasonably related in scope to the circumstances that justified the initial stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005). It is also clear that where an individual is detained after an initial lawful stop, the question is whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). Law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that criminal activity may be afoot. United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996). A police officer may also run a computer check to establish whether the vehicle might have been stolen or whether there are outstanding warrants for any passengers in the car. See United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995); United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). Additionally, if the responses provided give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. Id. at 357. This includes asking the driver for his license and registration, requesting him to sit in the patrol car, and inquiring as to the driver's destination and purpose. Id. Further, if a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. See United States

v. Jones, 269 F.3d 919, 924-25 (8th Cir.2001).  The Eighth Circuit has clearly held that, even without reasonable suspicion, if an encounter after a traffic stop's completion is consensual, a law enforcement officer may ask questions unrelated to the traffic stop and request consent to search the vehicle.  United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002).

Having made a valid stop in this case, Officer Talbert was acting within his authority in inquiring as to the purpose and destination of defendants' trip and in conducting the compliance inspection. Officer Talbert testified that he was unfamiliar with the trucking company, which is the main reason he stopped defendants' vehicle.  He developed suspicions about the vehicle and its purpose because of the unusual downtime in Dallas, and the discrepancies in the logbook.  He called for back-up from the Highway Patrol because he is not authorized to search a vehicle for evidence of criminal activity. During the time that it took Corporal Hall to arrive, Officer Talbert was conducting the routine compliance inspection, waiting for defendant to fix the warning light problem on the truck, and working on completing the paperwork.  He testified that he was not stalling with the paperwork, and that the vehicle's warning system had to be fixed before it could proceed.  There is no indication that the detention of the vehicle for inspection and repair purposes was any longer than necessary to conduct a lawful inspection, and accordingly, there is no basis to conclude that the detention was unreasonably long or intrusive.  There was nothing about the length of time that the initial inspection took, nor about the time that elapsed after Corporal Hall arrived on the scene, that would support defendant's contention that the detention was so lengthy as to have violated his Fourth Amendment rights.

When considering the totality of the circumstances, the Court finds, moreover, that the testimony adduced at the hearing established reasonable suspicion to conduct a search.  Based on the information gleaned from Officer Talbert regarding the suspicious nature of the downtime before

the truck left New Jersey, the downtime in Dallas, and the fact that it was traveling empty, and Corporal Hall's own first-hand observations of the level of nervousness displayed by defendant Mendez-Franco, there was reasonable suspicion to investigate further. Additionally, when Corporal Hall requested defendant's consent to search the trailer, there was no evidence that he did not understand the request or voluntarily provide that consent. In fact, Mr. Mendez-Franco admitted on the witness stand that he willingly consented and unlocked the trailer for the search. He then gave consent to search the cab of the truck, and testified that defendant also gave his consent.

While defendant has attempted to raised the issue of a language barrier in terms of his consent to search the vehicle, the Court finds this argument to be unpersuasive. According to the credible testimony of Corporal Hall, defendant Mendez-Franco willingly gave consent for the search, and unlocked the trailer. Additionally, both officers testified that neither defendant appeared to have any problem understanding English. Further, at the hearing, defendant Mendez-Franco testified without any apparent problem with English that would have inhibited him from knowledgeably and voluntarily giving consent to search. There was no evidence adduced at the hearing to suggest that the officer acted in any manner that would suggest deceit, duress, or coercion. Further, there is nothing to suggest that the search and seizure exceeded the scope of the consent to search given by defendant. Although there was some attempt to suggest that defendant might not have been fully awake when he gave his consent, even the testimony from defendant Mendez-Franco refuted that. He stated that defendant had been looking for some paperwork earlier, had just been sitting there when Corporal Hall was questioning him, and could hear everything that was being said. Therefore, it must be surmised that defendant was aware that Corporal Hall had articulated his suspicions about illegal activity to the driver of the vehicle and would understand that a search was being conducted for evidence of illegal activity. Accordingly, the Court finds that the

search of defendant's vehicle was permissible as a consensual search, and that probable cause existed to arrest defendant after the cocaine was found hidden in the roof of the cab.

Based on a full review of the evidence in this case, the Court finds that the officers acted within their legal authority; that the traffic stop and questioning were constitutionally valid; that the officer had reasonable suspicion to request consent to search; and that the search was consensual. Therefore, it must be recommended that defendant's motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate Judge

Date: May 15, 2009